Good morning, Your Honor. Good morning. Good morning. Your Honor, with all due respect to the government... You may want to introduce yourself. Oh, I'm sorry, Your Honor. I'm sorry. I was way past myself. My name is Howard Phillips, Your Honor, and I represent Mr. James Schweda, the appellate in this case. Thank you. You're welcome. I'll start over, I guess. With all due respect to the government, and at the risk of sounding hyperbolic, I wanted to state that in my opinion Mr. Schweda's conviction and sentence to 10 years was a travesty of justice, and I'm honored and privileged to be here on his behalf this morning. Sometimes the court gets it wrong, the trial court gets it wrong, and my client understands that, and that's why we're here today. He has asked me to implore this court to write a wrongful conviction that was basically the unintended consequences of a criminal judicial system that encourages the use of cooperating criminals to feed on one another to gain a conviction, and that's what happened in this case. Mr. Schweda has four issues before this court. One is regarding governmental misconduct related to two grand jury proceedings. The other is speedy trial violation. The other is sufficiency of the conspiracy conviction, and the fourth was denial of the safety valve proffer. I don't believe I'll get through all of them, but I will focus primarily on the grand jury. With respect to the speedy trial violation- Counsel, that's fine. Would you also address on the sufficiency of the evidence the questions on the LSD, on the quantities and the duration and the fronting of sales, just so I can understand what your client's position is? In what sense, Your Honor? Well, there's testimony about how much LSD was being sold to Ramos and the girlfriend, whose name I forget, Van Winkle, I think it is. There is evidence about quantity there. I think it also factors in on the marijuana thing about the sentence. But just focusing on the LSD amounts, I'm troubled by what the evidence shows with respect to the amount of drugs that were supposedly sold by your client to Mr. Ramos over what period of time and the like. You can go ahead with the grand jury. I just wanted to make sure you allocated your time because that's an issue. I can start with that, Your Honor, because I believe the government is saying, government's argument is that it was because of the amount of LSD involved that there was somehow some, raised some inference that there was a conspiracy based on- Conspiracy to distribute. Distribute, yes, sir. Because there was no agreement as was- You can prove it by circumstantial evidence. Circumstantial evidence. And they talked about the quantity and basically the government cited to the case, direct sales of the United States and all the cases that's cited by the government to include that one, Your Honor, they're talking about huge amounts of drugs, $300,000 to $350,000 in cash in the sales case as well as 79,000 one half gram tablets. In this case, the testimony, at least the testimony during the grand jury, was that the amount of sales of LSD involved would be indicative of distribution but not necessarily indicative of a conspiracy involving so- There was so much was sold that it had to have been considered for distribution as opposed to distribution- I'm not sure I understand your argument. Are you saying that there is enough to infer distribution as distinct from personal use but not enough to infer a conspiracy among more than one person? Is that your argument? No, Your Honor. I'm not saying that. First of all, that was the testimony of the agents, not necessarily what my client concedes that there was enough for to show- Well, there were, you know, hundreds of hits. Hundreds of hits, Your Honor. Right. That's why I'm asking you the question I'm asking you. So if there were hundreds of hits, is that sufficient to carry at least an inference of intent to distribute, leaving aside the conspiracy piece? Yes or no? Yes, Your Honor. Okay. Yes. So your argument is that you need more than hundreds to infer conspiracy. My argument, Your Honor, is he didn't sell it to them at all. And the jury wasn't free to believe that? The jury was free to believe that based on the testimony, Your Honor. Right. And what's our standard of review? We have to give all potential inferences of the testimony in favor of the jury's verdict. That's true, Your Honor. Yes, ma'am. Okay. So I concede that point, Your Honor. Okay. However, this case began before the jury. This case began at the time of the grand jury. It is the misconduct of the prosecuting attorney's office or the U.S. attorney's office. That misconduct is where this case began and where it should have ended before we got to the trial itself. I have a question about that to help me focus, too. There was an initial indictment and then a superseding indictment. That's correct. And I know that there was a motion to dismiss the original indictment. Was there also a motion filed to dismiss the superseding indictment? No, there was not, Your Honor. So what does that do to our ability to review the propriety of the superseding indictment? It obviously changes to plain error, Your Honor. Okay. And we're asking the court that there was plain error existed in this case. All right. If I can just point to the misconduct, Your Honor, if I may. The government's case was based on the statements of Ms. Van Winkle, Mr. Ramos, Mr. Meads, and Mr. Thurston, all of whom benefited. There was no evidence that my client had any connection with LSD, regardless of how you think about the marijuana or anything else. This case was about distribution of LSD. The agent, Ellis, who is now in the courtroom, I appreciate him being here, testified that the government was looking for to find the person who sold the Ramos and Van Winkle. They wanted the source. When they arrived at the place and executed their search warrant at the residence of Mr. Ramos and Mr. Van Winkle, my client was in the basement. After about an hour or so, well, when the police arrived, Mr. Ramos immediately got into a fight with the police. An hour later, he and Ms. Van Winkle said, well, the source is the guy in the basement, the guy in the basement, the hippie with the long dreadlocked blonde hair sleeping on the mattress in the basement out of two backpacks. I think that very fact, Your Honor, militates against that my client was a supplier. Regardless of that, if I can get straight to the point, the point is, I was a trial attorney, have been a trial attorney for 30 years, and it's what we call bad facts, good facts. The state, the government had a problem with bad facts. The bad fact is that there was no evidence directly relating to my client to LSD other than the comments of the cooperating witnesses. But the jury was entitled to listen to all of the evidence and decide if it believed the cooperating witnesses or not. It believed the cooperating witnesses, Your Honor, but the point is my client should never have been put in that jeopardy by the misconduct by the government in the first place. And the conduct was no conduct by my client of bad related to LSD. In fact, one of the grand jurors says, hey, stop. I don't see, I have a problem here. I don't see any evidence of Mr. Sueda being observed getting LSD. When he was arrested, he didn't have LSD. And the government's tact of dealing with that bad fact was to say, well, LSD was on the common areas of the house. I would point to the court to ER 47, which lists out where the exhibits were found. But can we go back and reexamine what was presented to a grand jury once the jury trial has ended? Yes, you can, Your Honor. Now, what case allows us to go back and reexamine the presentation to the grand jury after a jury verdict? Well, the government says mechanic is the case that denies, that is not possible by the client. Well, what do you say, what case do you say allows you to go back and reexamine? I would say Nova Scotia, Your Honor. I would say no T. What's your very strongest case for your argument that a defendant can reach back into the grand jury presentation after a guilty verdict? No T, Your Honor. How do you spell it now? No T-I. Okay. And the state's strongest case, Your Honor, is mechanic. I'll ask them the strongest case, but I'm asking you for your strongest case right now. Yes, it is, Your Honor. No T is our strongest case. Okay. Did you have that in your brief? Yes, I did, Your Honor. Okay. The misconduct was, if I could just back up here. Before I can get to that point, I would like to talk about mechanic because that is a case that's very important because the government is arguing that because of the guilty verdict, the court cannot, should not be able to go back. Mechanic did lay out a per se rule by Judge Rehnquist that said if there's a violation of this rule, I think it's rule 6D, if there is a violation, then it's not worth the cost to go back. It's a minor transgression of the rules, of the grand jury rules. And Judge Berger said, wrote that disapproving of a per se rule because the guilt automatically renders harmless any violation of the 6D that was found on page 76 applies in any violation substantially influenced by, influenced the decision to indict. Basically, any per se rule by, mentioned here by Justice Berger, if there's substantial influence of the grand jury by the prosecutors, this court then should act. I think Nova Scotia talks about the court's had the supervisory ability to do that. And also there's the constitutional aspect as well. Looking specifically at the proceedings before the second grand jury, what page, where will we find something that was misconduct? The misconduct, Your Honor, was saying that my client, first of all, saying that there was LSD found in the common areas of the house. That did not happen in front of the second grand jury. Yes, it did, Your Honor. Absolutely. It was the exact same thing. He says he's not sure. The second, but my point is the prosecutor's conduct. The prosecutor said the agent was asked what in the house he found of evidentiary value during the second grand jury. He asked, he was asked, did he find LSD in any common areas of, or areas of or locations in the house to which, to offer to Agent Ellis' benefit. He answered no. There was no LSD found in the common areas of the house. Then the prosecutor says, oh, and that question, the question was designed to link Mr. Sueda to LSD even if they could find it in any part of the house. So is that, you're on page, excerpt page 1194. Yes, ma'am. Lines basically 17 and 18, and that's where you want us to focus. Yes, Your Honor, and the most important thing. Witness says, I believe, I don't think, no. And the question, okay, if you're not sure, it's okay to say you're not sure. And that's, you're saying that's such outrageous misconduct that we should reach back and undo this entire thing. That, not only that, Your Honor, but you have to look at the court's order. The trial court found that it was not flagrant enough under Kennedy because it had multiple witnesses testifying that my client was a source. That's not the case. The trial court also found that there was, my client did not challenge that there was LSD found in the common areas of the house. There was no LSD found in the common areas of the house. All the LSD was found in room number one, which is the room of Ramos and Van Winkle.  You have about a minute and a half if you want to save some. Yes, ma'am. Thank you. Can I ask you a factual question? Sure, Your Honor. Were the jurors on the second round the same jurors who were the grand jury in the first round? I don't believe so, Your Honor. In fact, there was another set of. . . They didn't hear anything that was said, misstatements or anything in the first round? And in the common areas, testimony was given in both. Okay. You've answered my question. Thank you, Your Honor. Thank you. Good morning, Your Honors, and may it please the Court. My name is Michael Morgan. I represent the United States on this appeal. With respect to the claims of governmental misconduct before the grand jury, I think as Judge Graber has accurately pointed out, we really need to be focusing only on the second grand jury presentation. Anything that happened at the first grand jury was rendered academic once an independent presentation was made to the second grand jury. And they were a different grand jury? Well, I actually disagree with my colleague on that. It was the same grand jury. It was grand jury 091 that heard both.  So it was the same jury? It was. . . I can't. . . But it was, in fact, the same term of the grand jury. Well, that may be. But, you know, there's the ringing the bell and unringing the bell. So that's why I was asking. If the grand jury that issued the superseding indictment had never heard whatever was said in the first go-around, then they're just hearing Ellis' statements for the first time. But you can't assure us that that's. . . I cannot. The grand jury extends for a period of months. It must because these are separated by 8 to 10 months, something like that. That is correct. Well, typically, unless there's a death or some conflict or something, isn't the jury the same makeup for the term of the grand jury? Well, it is, Your Honor. But, you know, since you only need a quorum, you may not have the same. . . Exact same makeup. Exactly. And I can't represent, you know, that composition. Some may have heard it before. Some may have heard the initial presentation. Eight months before. Eight months before, yes. But the second presentation was completely independent. I mean, the government represented the entire case from soup to nuts. And in the second grand jury, you know, Officer Ellis made clear that he, you know, exactly where the LSD was found. It was very specific. It was only found in Ramos' room. The officer did testify that, quote, drugs were pretty much everywhere in the house. And that's a fairly accurate characterization. There were drugs all over the place. LSD, true, was only in Ramos' room. But the grand jury was specifically told that. Nobody was trying to suggest that there was any LSD found in Mr. Schweda's room. With respect to, and in fact, when Ellis was asked that question, as I gather, Mr. Schweda is taking issue with the prosecutor suggesting that because the agent showed some uncertainty about that fact, that he said, if you're not sure, say you're not sure, as opposed to falsely assuring the grand jury that it's something that he wasn't sure about. That's just not misconduct. That's just asking the agent to testify truthfully. So I fail to see how that is even remotely indicative of any misconduct. Unless the Court has any further questions about the grand jury presentation, I'll move on to the sufficiency point. My question, I guess, is to follow up on one that Judge Rawlinson asked earlier. What is the rule of inquiry or non-inquiry into a grand jury proceeding and its propriety after there has been a jury trial on the merits that's gone to verdict? Well, the government has to stake out an all or nothing position. Following McCannick in Nova Scotia, the scope of the inquiry is very limited. This Court has carved out an exception, but since McCannick in Nova Scotia, I have not been able to find a case where the Court has actually reversed the conviction, but you've held out the possibility that flagrant misconduct, namely knowing presentation of perjured testimony, might under the Court's supervisory powers allow the Court to go further. But there is no perjury here, let alone knowing presentation of perjury, and I might point out it has to be perjury on a material matter. And the fact of the matter is the circumstances of the search weren't the core, was not the core evidence against Mr. Schweda. As Mr. Schweda rightly points out, this case rose and fell on the testimony of his co-conspirators. I mean, this was a conspiracy case in the main. The evidence linking Mr. Schweda to the conspiracy, as well as the distribution counts, came in large measure from the testimony of the co-conspirators. The testimony regarding the search was corroborative of their statements that they were involved in the LSD trade. And the notebook, was that an evidence before the jury? The notebook was an evidence before the jury, and at trial, it was made very clear to the jury that that notebook, while physically present in the house when the search was executed, was not seized by the agents. It was provided to the government by Ms. Van Winkle about two months after the search, during her proper session. So the province of the notebook was an issue for the jury. They were informed of all the facts, and they could make their independent judgment about it. And that point was also, I should point out, with respect to the second grand jury, also made clear to the grand jurors that, in fact, that notebook was not found in Mr. Schweda's room. It was found, it was present in the house, but provided later. So, again, the second grand jury was accurately apprised of the very facts surrounding that particular piece of evidence. With respect to the sufficiency evidence, the jury was entitled to believe the co-conspirators. That was a jury question. That was the key question for the jury. Their testimony was corroborated in some measure by the telephone records that sort of confirmed the contacts between Mr. Schweda and his co-conspirators. But ultimately, at the end of the day, that was a question for the jury. And the jury obviously believed them. And if you believe that Mr. Schweda sold thousands of hits. Well, that's what I'd like to address. What's the evidence about this? My familiarity with LSD goes back to Timothy Leary. It ends more or less there. And a hit of LSD in those days could put you out of commission for a heck of a long time. It's all the stuff about flashbacks and everything else. So that's going way back to the 60s. Now, when I first started reading these hits, I'm thinking, my gosh, you're going to put somebody out of commission forever. But apparently these hits don't have the same potency of those original experimental uses or whatever Leary was doing. So can you just give me a sense? Because I'm just looking in specifics. Okay. Ramos testified that he bought LSD from Schweda at least 20 times. Now, my understanding is that that's over a two-year period between 2006 and 2008, 20 times. Yes, that's correct. Okay, and that sometimes it was an entire vial or a sheet of blotter paper, which could be what a vial is 100 to 130 doses, and there's a blotter paper that could have 1,000 to 1,200 doses. So that's why I'm asking this question. How do you give us context as to what that means? Well, I mean, the context is simply the numbers. But I can point you to the government's drug expert who testified about LSD, explained that an individual dose is between 150 and 300 micrograms, and it lasts between four and eight hours. That was the testimony that the jury heard. So you can start doing the math on thousands of hits and hours and see that this is just under no conceivable view could this be personal use. I mean, conservatively, the conservative estimate is that the number of hits that he sold to Ramos was about 2,000. And that's a conservative estimate. That's assuming that each individual sale was 100. And as Your Honor points out, there was some testimony about the blotter paper that it could be greatly in excess of that. We just, you know, to be conservative, we took 200 or 100 multiplied by 20. That's 2,000 over two years. With respect to the amount he sold to Meade, it's even greater. It's 3,000 to 3,200 over a four-month period. Now, that's no way that's personal use. So just from the quantity alone, the jury could certainly infer that this was an agreement to distribute and take into account the fact that Mr. Swade also fronted the drugs to Ramos on occasion. That is proof positive that this was a conspiracy to distribute. I mean, that's just the whole nature of the conspiracy is you're going to sell it and pay me. That's a conspiracy to distribute. Now, there was also reference, I don't know whether it was in the summary or a summary or whether the term fronting was used, but we've had cases that I'm familiar with where fronting, something which is to understand the term, the seller doesn't ask payment up front. It's selling it on consignment or credit or whatever, and apparently it can mean either one. That is, okay, I'm supplying you a straight buyer-seller relationship. You don't have the money today, but I'll give you the stuff basically on credit. You can run up a tab, so to speak, and pay me later. Or if there's a large quantity where you're fronting it and it's essentially on consignment, it does maybe carry more evidence that the seller knows that the buyer is going to get the money out of a resale. So what's the evidence of fronting and what kind, if there was fronting, what kind it was? Well, Van Winkle and Ramos both testified that on occasion, not all the time, it was not a, every transaction wasn't a fronting transaction, but that there were occasions where Mr. Schweda would front the drugs, and the fronting was I will give you the drugs and you will repay me. And Van Winkle actually testified that the second undercover sale, that was the tail end of a front, and that in fact Mr. Ramos used the proceeds from that sale to the undercover to pay Mr. Schweda. So that's the kind of front you had. It's the consignment front. But that's enough to say that Schweda knew that that was what was going on, or he just looking to get his money back and he wasn't caring about how he got it. Well, I think it's enough for the jury to infer, to draw that inference, is that if you front someone drugs, I'm giving you this quantity of drugs, I'm not asking for payment, and I understand that I'm going to get paid when you sell them. Well, that's an explicit agreement. No, no, no. Evidence of an explicit. Well, that's true. When you sell them. That's true. But I think the jury could certainly infer that Mr. Schweda did not give Mr. Ramos the drugs for free and was just sort of, you know, hoping to get repaid. Wait a minute. You're jumping ahead of what the proof may suggest. I said there's, you know, giving somebody drugs that you have an ongoing relationship, knowing that the person will pay you back. It's like a bartender lets somebody run a tab on an ongoing patron, and ultimately they pay up. But they're consuming the stuff there in their presence, obviously. In this case, you know, the guy says, look, I'll give it to you, but, you know, you've got a week to pay me back when you get your welfare check or whatever it may be. There's a big difference between using fronting in that sense and where you're – that's why the quantity is important as well. Because, you know, if there's a large quantity, you're not expecting that the person is going to probably – less likely, I suppose. But if all that he did was basically give them, you know, some doses on credit, in effect, it doesn't necessarily mean that it's a distribution operation as opposed to a straight buy-sell. I take Your Honor's point, and I think that if the evidence was that this was – I gave you one or two hits and I was waiting for my payment, your point would be well taken. But when the evidence is that once this operation started, the hits were 100-plus at a time, 100-plus at a time is simply not a quantity that's for personal use. So if I'm giving you at least 100 doses. Conflating some things. The question is, did he front quantities of the amount you're talking about? Or are you conflating testimony that talks about overall and then use fronting to make it reinforce the inference? Were, in fact, the fronting isolated as fronting with simply a few hits that were on credit? Well, Your Honor, I don't think – and I don't think you mean it in a pejorative way. I'm not trying to conflate the evidence. I'm drawing the inferences from the evidence. There is no testimony that on such-and-such a day I got 100 doses and that two days later I sold those doses and then I repaid Mr. Schweda. The evidence wasn't that clear. The evidence was is that once Mr. Ramos started this LSD operation, he was buying at least 100 doses at a time. Once he went from personal use to the distribution, he was buying about 100 doses at a time, maybe more. And some of those were on credit. And some of those were on credit. And from that, the jury – I mean, from simply the quantity, the jury conferred the agreement to distribute. But the fronting just sort of further supports that inference. If the Court has no further questions, we'll rest on our brief on the remainder of the points. I think we don't have any more questions. Thank you. Thank you, Your Honor. Mr. Phillips, you have a little bit of time remaining for rebuttal. First of all, Your Honor, I would ask the Court to look at Exhibit ER-47, which lays out where the exhibits were found and what exhibits were taken. Counsel here, again, misstates the evidence again and says drugs were found all over the house. Drugs were not found all over the house. There was LSD found in the Ramos' home, and then there was marijuana and MDA found in my client's. You just quoted what counsel said. What did the witness say to the grand jury about where the drugs were found? All over the house, Your Honor. All over the house when they were not. In fact, there was only one instance where drugs were found in the kitchen and there was suspected mushrooms that were found in the refrigerator that was found not to be mushrooms. There were no drugs in the common areas of the house. That's why I really want the Court to understand our focus is on the testimony is that there were drugs, specifically LSD, in the common areas of the house because they then could say by constructive possession that my client was in possession of the drugs. That's why they were focusing on the common areas of the house. To deal with the bad fact that there was no evidence, no observations of my client being in touch with LSD at all. Okay, now you didn't get a chance really to address my question about quantity. You heard counsel for the government's summary of it. Do you disagree with it in any way? Oh, totally, Your Honor, because the reason why... The quantification. The reason why the quantification, it's incredible, Your Honor. It really is incredible because the amounts they're talking about, that's $10 a hit. So you talk about 100 hits, that's $10,000. If my math is right, $1,000 or 2,500 hits, that would be incredible amounts of money. It just did not comport with the rest of the facts that my client was evicted from his home and was paying $200 a week to stay in the Ramos-Van Winkle home. Were you the trial counsel? Yes, I was, Your Honor. Okay, now did you argue that to the jury? I don't know if I argued that to the jury or not, Your Honor. All right. Thank you, counsel. We appreciate the arguments of both counsel. The case just argued is submitted.
judges: Graber, Fisher, Rawlinson